UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| PATRICK S. RYAN,<br><br>*Plaintiff*,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States of America,<br><br>and<br><br>WILBUR L. ROSS, JR., in his official capacity as United States Secretary of Commerce,<br><br>*Defendants*. | Case No. 3:20-cv-05948 (VGC)<br><br>**DECLARATION IN SUPPORT OF PLAINTIFF'S MOTION FOR <u>PRELIMINARY INJUNCTION</u>** |

STATE OF CALIFORNIA       )
                                                  )   ss.:
COUNTY OF SAN MATEO   )

PATRICK S. RYAN states:

1. I am employed as a technical program manager in the Mountain View, California, office of TikTok, Inc. I am also a scholar, professor and expert in Internet governance and free expression, and I am a licensed attorney in California, Colorado, New York, and New Jersey.

2. I make this declaration pursuant to Rule 7-5 of the Civil Rules for the Northern District of California, in support of plaintiff's motion for a preliminary injunction.

3. I have personal knowledge of the matters stated in this declaration and if called upon, could competently testify to those matters.

4. The effects of the Executive Order issued on August 6, 2020, threatens to terminate my paycheck and possibly my employment as early as September 20, making it impossible for me to meet financial obligations with my family. TikTok has not informed employees that they intend to pay us our wages and salaries because of the language of the Order. Indeed, I have been told by representatives of the company that the wording of the Order is so broad as to encompass payment of wages and salaries, and that TikTok does not wish to violate the terms of the Order. That leaves me logically to conclude that TikTok may not pay me or other U.S. employees our wages and salaries after the Order takes effect on September 20, 2020. In addition, the Order alleges acts that create irreparable reputational damage and emotional distress, and if the accusations remain unaddressed they will do irreparable harm to my future employment marketability.

5. My responsibilities at TikTok as a technical program manager ("TPM") include the hiring and management of technical personnel who implement TikTok's global security programs, products, applications, and systems. I started work at TikTok, Inc. on April 2, 2020. The security programs I support are for the TikTok product itself, a short-form video-sharing app that operates on iPhone and Android devices. As of September 2, 2020, TikTok is one of the most popular global apps, with more than 2.3 billion downloads worldwide and more than 100 million users in the United States. I work on technical programs that include the receipt and processing of security vulnerabilities that are reported to us by users or discovered by security specialists.

6. ByteDance Ltd. owns two separate short-form video apps that are designed for different users and systems: TikTok is the product that operates globally, except in China, and Douyin is the name of the product that operates within China, but not globally. TikTok's security is operated by TikTok, Inc., and my team and I are responsible for TikTok's global security operations. This includes technical security programs in all countries except China. The systems and products operated in China are a different product, administered by a different subsidiary and with a separate network infrastructure

and functionality. On information and belief, Douyin is owned and operated by Beijing Bytedance Technology Co., Ltd.

7. I became familiar with TikTok in 2016 in its prior form, Musical.ly. One of my daughters found a community on Musical.ly and struck up several friendships with the Musical.ly users, and we traveled in 2016 to Musical.ly-sponsored meet-ups in Austin and Los Angeles. Because of my daughters' interest in the app, I watched it closely and became particularly interested when the founder and CEO of ByteDance, Yming Zhang, who partnered with the founder of Musical.ly, Alex Zhu, to bring ByteDance's AI and experience to the Musical.ly users, formed the brand TikTok in August 2018.

8. I was initially interested in TikTok as a father of daughters who love the app, and I looked into open positions at the company shortly after the Musical.ly acquisition. At that time, Musical.ly (by then, TikTok) employed only about 300 people. Still, the opportunity to work on this fast-growing multinational product intrigued me and in early 2020 I began discussions with TikTok to discuss fit, values, and goals. After several weeks of interviews, I decided to join TikTok.

9. In addition to my work at TikTok, I am a scholar and author in the areas of Internet governance and free expression. I've published more than three dozen law-review or policy articles in the area of technology regulation. Most of these articles are publicly accessible online at the Social Science Research Network (SSRN), and for the past several years the downloads of my scholarship have ranked me among the "top 10%" of all downloads from SSRN over a 12-month period. My publications are available at https://www.ssrn.com/author=355448.

10. My interest in Internet governance has been a mix of compensated and volunteer roles, both of which stand to be irreparably harmed by the Order. I am a lecturer and researcher on Internet policy. I was the Associate Faculty Director (2004–2005) and Faculty Director (2005–2008) of the Interdisciplinary Telecommunications Program at the University of Colorado, Boulder ("CU-Boulder"), and later held an appointment as an Adjunct Professor until I moved from Colorado to California in 2016. At CU-Boulder I oversaw 25 faculty and 160 graduate students in the study of interdisciplinary

telecommunications, with a joint teaching appointment at the School of Law and at the College of Engineering and Applied Sciences.  At the School of Law I taught International Law and also taught cross-listed law and engineering courses on International Telecommunications Policy and International Standards.  Other volunteer, non-compensated academic roles that I've held include an appointment in 2006 at the Global Law Professor program at the Katholieke Universiteit Leuven in Belgium, the same institution where I received my PhD in 2004 and defended a dissertation on global regulatory approaches for wireless spectrum.  I am frequently invited as an unpaid, volunteer guest lecturer for academic programs on technology policy, including an annual lecture that I give at the UCLA MBA program on international technology strategy – with a focus on China – a lecture I've delivered each of the past five years on a volunteer basis.

11. My work in the field of Internet freedom and free expression isn't limited to academia.  In 2011 I was recruited to Google for the role of Policy Counsel, Open Internet and later promoted to Senior Policy Counsel, International Relations & Free Expression, a role I held until 2014.  My main responsibility in these roles was to represent the interests of Internet openness and free expression at the United Nations and international agencies.  From 2014 to 2020, so that I could eliminate travel and be at home with my daughters, I transferred out of the public policy to strategic programs as a Trust, Strategy and Engineering Principal.  One of the areas I worked on was Google's enterprise strategy (for GSuite) for the China market. This assignment required me to develop a good understanding of the regulatory framework in China and the requirements for operating networks there.

12. I was appointed to and served a three-year term on the United Nations Internet Multistakeholder Advisory Group ("MAG") from 2012 to 2015.  MAG advisors represent the Internet's global users, technologists and reconcile policy interests of governments and civil society.  During this time I helped coordinate numerous global policy discussion panels at UN-sponsored events about Internet policy.

13. I have also represented the U.S. government in policy matters. In 2012, the U.S. government engaged in treaty negotiations called the World Conference on International Telecommunications (WCIT-12). In that capacity, even while an employee at Google, I was appointed by the U.S. State Department as a delegate of the State Department at WCIT-12 for the treaty negotiations in Dubai. In this capacity I became familiar with the academic background of Internet governance and free expression, and I used those same policies to advocate on behalf of the United States with countries such as China, Russia and Turkey, and my effectiveness in these roles is due to my expertise in engineering architecture, international data flows, free expression, international law, and trade. This work on Internet policy has been focused on reducing undue government influence on the Internet and stands to be irreparably harmed by the unfounded claims in the Order.

14. Another relevant aspect of my background that the Executive Order stands to irreparably harm is my practice as a lawyer. Although my law practice has taken backstage to my work in the tech sector in the last 10 years, I am a licensed, active member of the bar of four states: California, Colorado, New York and New Jersey. I am current on all of my Professional Responsibility obligations. In fact, I have taken the topic of legal ethics very seriously ever since law school, where I was awarded the Keck Award in Professional Ethics, given by the Dean for the highest grade in Ethics for the graduating class for year 2000 from the University of Texas School of Law. The unfounded accusations in the Order create an appearance of impropriety in matters of trust and fiduciary responsibility that are inconsistent with the obligations that the Rules of Professional Conduct require of me even when I am not practicing law.

15. The Executive Order threatens to take my paycheck, and possibly even my employment, but it also makes several allegations which, if left unaddressed, threaten to cause irreparable harm to my personal and professional reputations as an employee who works in the technology sector, as a scholar on the subject of Internet governance, as a professor of Internet law and policy, and as a lawyer. For example, a main theme of the Order is that TikTok's data collection is really just a channel

for all kinds of illegal activity on behalf of the Chinese Communist Party, "potentially allowing China to track the locations of Federal employees and contractors, build dossiers of personal information for blackmail, and conduct corporate espionage." *See* Order at p. 3.

16.     It was immediately obvious to me when reading the Order that the government's allegations about espionage and other matters, if they are occurring, cannot happen in the abstract; they require humans to be complicit. If these wild accusations of treason, blackmail and espionage remain stated but unproven, and if the punishment is carried out --- i.e., to completely eliminate or change our jobs with no proof, only allegations --- then I will forever carry the stigma of having worked for a company accused of treason, blackmail and espionage, with no opportunity to clear my name. This will indelibly stain my more than 17 years of work as an academic, author, and attorney by linking me to the very evils that I have built a personal reputation for opposing.

17.     Another claim of the Executive Order is that "TikTok also reportedly censors content that the Chinese Communist Party deems politically sensitive, such as content concerning protests in Hong Kong and China's treatment of Uyghurs and other Muslim minorities." Like the prior unfounded accusation of treason, blackmail and espionage, this untrue and unfair accusation of censorship and collaboration with the Chinese Communist Party threatens the very core of the reputation I've built to support principles of free expression and Internet openness. There is no disputing that TikTok curates user-generated content, just as all other private social-media platforms, including Facebook and Google, do. As a lawyer, however, I am keenly aware that the First Amendment forbids government-imposed censorship, but also protects non-governmental platforms (like bookstores, newsstands, and libraries) in their right to decide what not to carry. The Order's use of the word "censors" is inappropriate, because "censorship" is a concept that applies only to governments, not to the private sector. As such, the accusation in this case is that my coworkers and I are collaborating in some way with the Chinese Communist Party. This is an accusation that, if left unaddressed, would lay waste to the reputation that

I've built defending the importance of government restraint when it comes to censorship. Also, it will do irreparable harm to my reputation that I have built on principles of openness and free expression.

18. The Order further claims that employees are intentionally misleading users with "disinformation campaigns . . . that benefit the Chinese Communist Party." *See* Order at p. 4. I have never received any instructions from the Chinese Communist Party nor have I ever met any member of the Chinese Communist Party at work. I am unaware of any "campaigns" that the U.S. government considers to be "disinformation" nor am I aware of any government-designated Ministry of Disinformation or similar entity that's responsible for clearing and approving information of different kinds in the United States. (The Order does not name or specify any such entity that might be running these "campaigns.") The accusation that I have cooperated with the Chinese Communist Party in disinformation campaigns is a serious accusation. If it is left unaddressed, my reputation may be harmed as my future employers may believe that I may have been masquerading as a believer of Internet freedom, but may have been involved in an unproven McCarthy-like accusation of involvement in a Communist collaboration scheme shut down overnight by the U.S. government. The accusation itself reads like an impossible conspiracy theory.

19. The final concern that I have about the Order is the new form of criminal "conspiracy" that it defines, a definition not found anywhere in the federal law. The Order states that "Any conspiracy formed to violate any of the prohibitions set forth in this order is prohibited." *See* Order, at Section 1(b). The problem is that any attempt to oppose this Executive Order (including perhaps this lawsuit) can be interpreted by the Government as a conspiracy "to violate any of the prohibitions set forth in this order." I am familiar with the definition and punishment for "conspiracy" in Title 18, Section 371, which is why I recognize that the "conspiracy" that the Order defines is a new kind of "conspiracy," that amounts to an *ex post facto* law because it creates crimes and imposes punishments that are not recognizable by me, or any other ordinarily prudent person until after the acts are committed.

20. Even if the Secretary of Commerce declares certain transactions to be allowed, the Order does not instruct the Secretary of Commerce to provide further clarification for me or other employees on what constitutes a "conspiracy" under the Order. Further, as a licensed attorney, I'm held to a higher standard than non-attorney citizens because of the Rrules of Professional Conduct, making accusations of misconduct particularly relevant. According to the California Rules of Professional Conduct ("RPC"), violations of the ethical standards to which an attorney must adhere "can occur when a lawyer is acting in propria persona or when a lawyer is not practicing law or acting in a professional capacity." Cal. RPC 8.4, Comment 1.

21. Even while working at TikTok as a TPM and not as a lawyer I am bound by these professional conduct rules and must avoid any act "that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects" including "dishonesty, fraud, deceit." Cal RPC 8.4 (b) and (c). Although I am certain that my acts do not violate trust, honesty, nor create fraud or deceit, the Order's accusations are, in fact, matters of dishonesty, fraud, and deceit and are made without proof or opportunity to face my accuser. For example, the Order's accusations of treason, blackmail, and espionage can be particularly destructive of a lawyer's reputation because RPC 8.4 creates a higher standard and expectation of conduct, even outside the practice of law.

22. Finally, the broad wording of "conspiracy" means that, even if my paycheck at TikTok becomes an authorized transaction by the Secretary of Commerce, I still won't know whether I should continue my global responsibilities for the TikTok technical network in the same way as before the Secretary's pronouncement. There is no provision in the Order that requires the Secretary of Commerce to identify which of my job functions are allowed and which are prohibited.

23. I declare under penalty of perjury under the laws of California that the foregoing is true and correct. Executed this 3rd day of September, 2020, at Palo Alto, California.

_____
PATRICK S. RYAN