**BLACKSTONE LAW GROUP LLP**
1201 Broadway, 9th Floor
New York, New York 10001
Tel./Fax: (212) 779-3070
*Lead Counsel for Plaintiff*

Patrick S. Ryan – Cal. Bar No. 243711
1454 12th Street
Oakland, CA 94607
Tel.: (512) 333-1287
*Local Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| PATRICK S. RYAN,<br><br>*Plaintiff*,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States of America,<br><br>and<br><br>WILBUR L. ROSS, JR., in his official capacity as United States Secretary of Commerce,<br><br>*Defendants*. | Case No. 3:20-cv-05948 (VGC)<br><br>**NOTICE OF EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER** |

TO DEFENDANTS AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on a date and time to be determined by the Court, but no later than September 20, 2020, Plaintiff will and hereby does move this Court pursuant to Federal Rule of Civil Procedure 65 and Northern District of California Local Rules 7-1 and L.R. 65-1 for a Temporary Restraining Order seeking relief from an Executive Order of the President of the United States that is set to take effect on September 20, 2020. We are seeking the following relief:

1.      To enjoin Defendants, and each of them, from enforcing the August 6, 2020 Executive Order 13942 to prohibit the payment of wages and salaries to Plaintiff or any other U.S. employee of TikTok;

2.      To enjoin Defendants, and each of them, from seeking to impose civil or criminal penalties on Plaintiff or any other U.S. employee of TikTok pursuant to 50 U.S.C. § 1705 for any alleged violation of the Executive Order 13942 based on any conduct that occurs (i) before the Secretary of Commerce identifies what "transactions" are prohibited by the Order; or (ii) any conduct by Plaintiff or any other U.S. employee of TikTok that is part of their regular job duties and responsibilities;

3.      To grant the relief above without requiring a security; and

4.      To grant such other and further relief as this Court may deem just and proper.

This motion is based upon this Notice of Ex Parte Motion and Motion for Temporary Restraining Order; the Memorandum of Law in Support of Plaintiff's Ex Parte Motion for a Temporary Restraining Order; the Declaration of Patrick S. Ryan and the exhibit attached thereto, all filed herewith, and such other pleadings, oral argument and/or documentary evidence as may come before the Court upon the hearing of this matter.  A Proposed Temporary Restraining Order also is attached hereto, and a copy in Microsoft Word format has been emailed to vcpo@cand.uscourts.gov.

Pursuant to the "Standing Order for Civil Cases Before Judge Vince Chhabria" regarding "Emergency Applications," Plaintiff's counsel notified Defendants' counsel, Ms. Sara Winslow, Esq., Chief of the Civil Division of the Department of Justice in the Northern District of California, of our intention to file this motion and have sent a courtesy copy by e-mail to her at the following address: sara.winslow@usdoj.gov.

Dated:  September 5, 2020

**BLACKSTONE LAW GROUP LLP**
By: /s/ John D. Lovi
    John D. Lovi (john@blackstone-law.com)*
    Justin B. Perri (justin@blackstone-law.com)*
    Alexander J. Urbelis (alex@blackstone-law.com)*
1201 Broadway, 9th Floor
New York, New York 10001
Telephone/ Facsimile: (212) 779-3070
*Lead Counsel for Plaintiff Patrick S. Ryan*

By: /s/ Patrick S. Ryan
    Patrick S. Ryan – Cal. Bar No. 243711
    Michael Godwin (mike@godwins.law)*
1454 12th Street
Oakland, California 94607
Tel.: (512) 333-1287
*Local Counsel to Plaintiff*

*\* Pro Hac Vice Applications Forthcoming*

**BLACKSTONE LAW GROUP LLP**
1201 Broadway, 9th Floor
New York, New York 10001
Tel./Fax:  (212) 779-3070
*Lead Counsel for Plaintiff*

Patrick S. Ryan – Cal. Bar No. 243711
1454 12th Street
Oakland, CA 94607
Tel.: (512) 333-1287
*Local Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| PATRICK S. RYAN,<br><br>　　　　　*Plaintiff*,<br><br>　　v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States of America,<br><br>　　　　and<br><br>WILBUR L. ROSS, JR., in his official capacity as United States Secretary of Commerce,<br><br>　　　　*Defendants*. | Case No. 3:20-cv-05948 (VGC) |

## MEMORANDUM OF LAW IN SUPPORT OF
## <u>PLAINTIFF'S EX PARTE MOTION FOR A TEMPORARY RESTRAINING ORDER</u>

# TABLE OF CONTENTS

PAGE

I.     INTRODUCTION ............................................................................................... 1

II.    STATEMENT OF FACTS .................................................................................. 3

       A.   What is TikTok? ..................................................................................... 3

       B.   President Trump's Disdain for TikTok .................................................. 4

       C.   The Executive Order .............................................................................. 4

III.   LEGAL STANDARD FOR EMERGENCY RELIEF ....................................... 6

IV.    ARGUMENT ...................................................................................................... 7

       A.   Plaintiff Is Likely to Prevail on His Claims ......................................... 7

            1.   Due Process Claims Under the Fifth Amendment ....................... 7

                 a. Plaintiff Has Both a "Property" and "Liberty" Interest in
                    His Employment ................................................................... 8

                 b. "Equal Protection" Component of the Fifth Amendment ..... 10

                 c. "Vagueness" Claim ............................................................... 11

            2.   *Ultra Vires* Claim ...................................................................... 12

       B.   Plaintiff Will Suffer Irreparable Harm
            Absent This Court's Intervention .......................................................... 14

       C.   The Public Interest and Balance of
            Equities Weigh in Plaintiff's Favor ...................................................... 14

       D.   The Court Should Waive Bond ............................................................. 15

V.     CONCLUSION ................................................................................................... 15

## TABLE OF AUTHORITIES

### CASES

PAGE

*Abdelfattah v. Dep't of Homeland Sec.,* 787 F.3d 524, 538 (D.C. Cir. 2015) ............................. 11

*Air Transport Ass'n of America v. Export-Import Bank,* 840 F. Supp. 2d 327 (D.D.C. 2013) ... 14

*Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury,* 686 F.3d 965 (9th Cir. 2012)......... 8

*Armstrong v. Exceptional Child Ctr., Inc.,* 575 U.S. 320 (2015) ................................................ 12

*Bolling v. Sharpe,* 347 U.S. 497 (1954) ................................................................................... 10

*Bustamante v. Mukasey,* 531 F.3d 1059 (9th Cir. 2008).......................................................... 7, 8

*Calvillo Manriquez v. Devos,* 345 F. Supp. 3d 1077 (N.D. Cal. 2018) ........................................ 14

*Castaneda v. U.S. Department of Agriculture,* 807 F.2d 1478 (9th Cir.1987) ............................ 7

*Cummings v. Missouri,* 4 Wall 277 (U.S. 1866) ...................................................................... 12

*F.C.C. v. Fox Television Stations, Inc.,* 567 U.S. 239 (2012)..................................................... 11

*Greene v. McElroy,* 360 U.S. 474 (1959) ................................................................................. 8

*Heineke v. Santa Clara Univ.,* 736 F.App'x 622 (9th Cir. 2018) ................................................ 14

*Hunter v. Underwood,* 471 U.S. 222 (1985)............................................................................. 6

*Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U.S. 123 (1951).................................... 9

*Jorgensen v. Cassiday,* 320 F.3d 906 (9th Cir. 2003).............................................................. 15

*Kartseva v. Dep't of State,* 37 F.3d 1524 (D.C.Cir. 1994) ....................................................... 8

*Kerry v. Din,* 576 U.S. 86 (2015)............................................................................................ 7

*Liff v. Office of Inspector Gen. for the U.S. Dep't of Labor,* 156 F.Supp. 3d 1 (D.D.C. 2016).... 11

*McCreary Cty. v. ACLU of Ky.,* 545 U.S. 844 (2005) ............................................................ 6, 9

*Melendres v. Arpaio,* 695 F.3d 990 (9th Cir. 2012)................................................................... 14

*Merritt v. Mackey,* 827 F.2d 1368 (9th Cir. 1987).................................................................... 8

*Niken v. Holder,* 556 U.S. 418 (2009) .................................................................................... 6

*Nunez v. City of Los Angeles,* 147 F.3d 867 (9th Cir. 1998) .................................................... 7

*O'Bannon v. Town Court Nursing Center,* 447 U.S. 773 (1980).................................................. 7

*Orloff v. Cleland,* 708 F.2d 372 (9th Cir. 1983) ...................................................................... 8

*Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133 (2000)............................................ 9

**PAGE**

*Reno v. ACLU,* 521 U.S. 844 (1997)..................................................................... 12

*Republic of the Philippines v. Marcos,* 862 F.2d 1355 (9th Cir. 1988) ........................................ 6

*Santa Fe Indep. Sch. Dist. v. Doe,* 530 U.S. 290 (2000) .............................................. 9

*Shell Offshore, Inc. v. Greenpeace, Inc.,* 709 F.3d 1281 (9th Cir. 2013) ...................................... 6

*Sniadach v. Family Finance Corp.,* 395 U.S. 337 (1969) .............................................. 8

*Stuhlbarg Int'l. Sales Co. v. John D. Brush & Co.,* 240 F.3d 832 (9th Cir. 2001)........................ 6

*United States v. Lovett,* 328 U.S. 303 (1946)......................................................... 4, 12

*Valmonte v. Bane,* 18 F.3d 992 (2d Cir. 1994) ............................................................. 7

*Washington v. Trump,* 847 F.3d 1151 (9th Cir. 2018) .................................................... 6

*Wedges/Ledges of Cal., Inc. v. City of Phoenix,* 24 F.3d 56 (9th Cir. 1994)................................ 7

*Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7 (2008) ......................................... 6

## U.S. CONSTITUTION

U.S. Const. Art. I, § 9 .............................................................................. 12

U.S. Const. 5th Amendment ........................................................................ passim

U.S. Const. 14th Amendment ...................................................................... 12

## STATUTES

5 U.S.C. 551, *et seq*................................................................................. 2

28 U.S.C. § 1651................................................................................. 2, 12

50 U.S.C. § 1601, *et seq*............................................................................ 13

50 U.S.C. § 1701(a) ................................................................................. 13

50 U.S.C. § 1705(b)–(c).............................................................................. 12

## SECONDARY SOURCES

Wylie H. Davis, *United States v. Lovett and the Attainder Bogy in Modern Legislation* Wash. U.
    L Q. 013 (1950...................................................................................... 4

## I.      INTRODUCTION

This action is brought by a U.S. employee of TikTok, Inc. ("TikTok") against the President of the United States and the Secretary of Commerce to prevent the implementation of the President's August 6, 2020 "Executive Order on Addressing the Threat Posed by TikTok" (the "Executive Order") purporting to ban all "transactions" with TikTok, to the extent that order would prevent TikTok from paying its U.S. employees their wages and salaries when the order takes effect on September 21, 2020.

The President's sweepingly broad Executive Order prohibits "any transaction" between persons or entities subject to the jurisdiction of the United States on the one hand, and ByteDance Ltd. ("ByteDance") or any of its subsidiaries, on the other hand, on the grounds that TikTok is a national security risk because it is purportedly controlled by the Chinese Government.  Although TikTok is an indirect subsidiary of ByteDance, it is neither owned, operated, nor controlled by China or the Chinese government.  Indeed, TikTok is a U.S. company and does not even operate in China.

The Executive Order directs the Department of Commerce to "identify the transactions" subject to the order but allows the Department to wait until the day the order takes effect to promulgate any rules.  It is not possible to know whether the Commerce Department will exempt the payment of wages and salaries from the dictates of the Executive Order, but a plain reading of the language of the order would prohibit the payment of wages and salaries to U.S. employees of TikTok within the definition.

The more than 1,500 TikTok employees working in the U.S. – and their families – need to know whether they will be paid in the coming weeks.  These employees include U.S. citizens that have families to feed, rents and mortgages to pay, and health care to manage.  In addition, many TikTok employees working in the United States are here on H-1B Visas, which require their employers to sponsor their visa status.  These workers, lawfully present in the United States, must leave the U.S. immediately – or risk deportation – if their employment status is constructively terminated by the effect of the Executive Order.

Furthermore, TikTok employees in the United States – U.S. persons and citizens – have been defamed and disgraced by the President's Executive Order, which accuses TikTok, and its U.S. employees of, among other things, working for the Chinese Communist Party, building dossiers on U.S. citizens and defense contractors for the purpose of blackmail and corporate espionage, censorship, and even spreading conspiracy theories about the origins of the Coronavirus. The President made these accusations without any evidence that any such actions or activities have ever occurred.

TikTok is an appealing political target for President Trump because he believes that the popular social media platform caused his campaign to embarrass itself over the expected attendance at his political rally in Tulsa, Oklahoma on June 20, 2020, and because many TikTok users use the platform to satirize the President. As a result, the U.S. employees of TikTok and their families have been made pawns in a political spitting match between China and President Trump, who has decided to make "Tough on China" a central theme of his re-election campaign.

President Trump's August 6 Executive Order is an unlawful and unconstitutional abuse of executive power that violates the Due Process rights of TikTok employees guaranteed by the Fifth Amendment of the U.S. Constitution in that it (1) deprives Plaintiff of his constitutionally recognized "property" interest in his job and salary without notice or an opportunity to be heard; (2) deprives Plaintiff of his constitutionally recognized "liberty" interest in pursuing his employment of choice; (3) discriminates against Plaintiff based solely on his employment affiliation with a so-called "Chinese" company, although U.S. employees of other social media companies doing the exact same work are not; and (4) is unconstitutionally vague regarding what acts or actions constitute a "conspiracy" to engage in prohibited "transactions" with TikTok. Moreover, the Executive Order exceeds the President's authority and is therefore *ultra vires* and void *ab initio*. In addition, the Complaint in this case asserts other claims under the Administrative Procedures Act ("APA") and the All Writs Act, as well as the Takings Clause of the Fifth Amendment of the U.S. Constitution, that may not be ripe at the time of this filing but will likely become so during the pendency of this motion.

## II.   STATEMENT OF FACTS[1]

### A.   What is TikTok?

TikTok is a short-form video-sharing app that allows users to create and share 15-second videos from their iPhone or Android devices.  (Declaration of Patrick S. Ryan, made on September 5, 2020, ("Ryan Decl.") ¶ 5.)  TikTok has become one of the most popular social media platforms in the world, with more than 2.3 billion downloads worldwide and more than 100 million users in the U.S.  (Ryan Decl. ¶ 5.)  The TikTok app was created from a merger of two popular social media apps: Musical.ly, founded in Los Angeles in 2014, and technology from Douyin, launched in China in 2016.  Douyin is owned by ByteDance, a company founded in 2012 by a 29-year old entrepreneur Zhang Yiming.  (Ryan Decl. ¶ 6.)  ByteDance is a Cayman Island company.

In November 2017, ByteDance acquired Musical.ly and rebranded the platform into TikTok a year later.  (Ryan Decl. ¶ 7.)  TikTok operates around the world but not in China; Douyin operates in China but not elsewhere.  (Ryan Decl. ¶ 6.)  The two platforms – Douyin and TikTok – are entirely separate and distinct.  (Ryan Decl. ¶ 6.)  The main thing they share in common is that both platforms, and the companies that operate them, have ByteDance as their ultimate parent entity.  (Ryan Decl. ¶ 6.)

TikTok's operations are conducted through the entity TikTok, Inc. and ByteDance, Inc., both U.S. companies incorporated under the laws of the State of California, and headquartered in Culver City, CA.  TikTok has more than 1,500 employees in offices across the United States.  (Ryan Decl. ¶ 6.)  TikTok stores U.S. user data on servers in the United States and Singapore – not in China.  (Ryan Decl. ¶ 6.)  The data collected and maintained by TikTok on these servers is not accessible in China or by any company or governmental entity in China.  (Ryan Decl. ¶ 6.)

---

[1] A more complete statement of the facts pertinent to this motion is found in the Complaint, annexed hereto as Ryan Decl., Ex. 1.

**B.**     **President Trump's Disdain for TikTok**

In June 2020, the Trump campaign was planning its first official campaign rally in Tulsa, OK.

President Trump tweeted that "Almost One Million people request tickets for the Saturday Night Rally

in Tulsa, Oklahoma!"  Fewer than 6,200 people actually attended.[2]  President Trump was reportedly

"furious" at this result.[3]  After the rally, it was reported that an anti-Trump campaign on TikTok was

partially responsible for the embarrassing turnout.[4]  Thousands of TikTok users posted videos joking

that they could not make the rally, but had registered for free tickets on the "Trump 2020" website.

Two weeks after the Tulsa debacle, Secretary Pompeo announced that the US was considering

banning TikTok over privacy concerns.[5]  The next day, President Trump stated that he was considering

banning TikTok in retaliation for Beijing's handling of the coronavirus.[6]

**C.**     **The Executive Order**

On May 15, 2019, President Trump issued Executive Order 13873, titled "Securing the

Information and Communication Technology Services Supply Chain," declaring a "national emergency"

with respect to the threat posed by unidentified "vulnerabilities in information and communications

technology and services."  The order did not identify any particular company or country that posed such

a national security threat.

---

[2] Justin Wise, *Tulsa Fire Department says Trump rally attendance was about 6,200*, The Hill (Jun 21, 2020), https://thehill.com/homenews/campaign/503781-tulsa-fire-department-says-trump-rally-attendance-was-about-6200?rnd=1592751253.

[3] Monica Alba, Kristen Welker and Carol E. Lee, *Trump 'furious' about 'underwhelming' crowd at Tulsa rally*, NBC News (Jun 21, 2020), https://www.nbcnews.com/politics/2020-election/trump-furious-underwhelming-crowd-tulsa-rally-n1231674).

[4] Taylor Lorenz, Kellen Browning and Sheera Frenkel, *TikTok Teens and K-Pop Stans Say They Sank Trump Rally*, NY Times (Jun 21, 2020), https://www.nytimes.com/2020/06/21/style/tiktok-trump-rally-tulsa.html.

[5] Timothy Bella, *Pompeo says the U.S. is 'certainly looking at' banning TikTok and other Chinese apps*, Washington Post (Jul. 7, 2020), https://www.washingtonpost.com/nation/2020/07/07/tiktok-ban-china-usa-pompeo/.

[6] *President Donald Trump talks about banning TikTok on Full Court Press* (Jul. 10, 2020), https://www.wilx.com/video/2020/07/10/president-donald-trump-talks-about-banning-tik-tok-full-court-press/.

On August 6, 2020 – 14 months later – the President issued the Executive Order against TikTok. This order does not declare a new national emergency.  Rather, it relies on powers purportedly available by the national emergency declared in Executive Order 13873 and claims that "action must be taken at this time to address the threat posed by one mobile application in particular, TikTok."

Section 1(a) of the Executive Order states that "any transaction by any person . . . with ByteDance Ltd . . . or its subsidiaries . . ."  "shall be prohibited beginning 45 days after the date of this order."  Section 1(c) states that "45 days after the date of this order, the Secretary [of Commerce] shall identify the transactions subject to subsection (a) of this section."

Section 2(a) of the Executive Order states that "Any transaction by a United States person or within the United States that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate the prohibition set forth in this order is prohibited."  Further, Section 2(b) of the Executive Order states that "Any conspiracy formed to violate any of the prohibitions set forth in this order is prohibited."

Section 4 of the Executive Order further empowers Commerce Secretary Ross "to take such actions, including adopting rules and regulations, and to employ all powers granted to me by IEEPA as may be necessary to implement this order."  Under the terms of the Executive Order, any person or entity that engages in a prohibited "transaction" may be prosecuted under IEEPA, which provides for civil penalties of $250,000 and criminal penalties of 20 years in prison and $1 million in fines.

### III.   LEGAL STANDARD FOR EMERGENCY RELIEF

The standards for a temporary restraining order and a preliminary injunction are "substantially identical." *Stuhlbarg Int'l. Sales Co. v. John D. Brush & Co.,* 240 F.3d 832, 839 n.7 (9th Cir. 2001). Injunctive relief should be issued where a plaintiff demonstrates "(1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  The final two factors "merge when the Government is the opposing party." *Niken v. Holder,* 556 U.S. 418, 435 (2009).  However, even where "a plaintiff can only show that there are serious questions going to the merits – a lesser showing than likelihood of success on the merits – a preliminary injunction may still issue if the balance of the hardships tips sharply in the plaintiff's favor and the other two *Winter* factors are satisfied." *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (citation and quotations omitted).  "Serious questions" are those that are "substantial, difficult, and doubtful" enough to require more thorough investigation.  *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988).

Courts look to a number of factors in assessing the purpose behind challenged governmental conduct, including, among others, the nature and degree of disparate impact; the historical background and specific series of events leading to enactment; the legislative or administrative history; contemporaneous statements made by the decisionmakers; previous versions of the policy; and any departures from normal processes or substantive considerations.  *See Hunter v. Underwood*, 471 U.S. 222, 227–28 (1985); *McCreary Cty. v. ACLU of Ky.*, 545 U.S. 844, 861–66 (2005).  Therefore, this Court must consider not only the text and effect of the Executive Order, but also "the contemporaneous legislative history," "the historical context," and "the specific sequence of events leading to [its] passage." *McCreary*, 545 U.S. at 862; accord *Washington v. Trump*, 847 F.3d 1151, 1167 (9th Cir. 2018) ("It is well established that evidence of purpose beyond the face of the challenged law may be considered").

# IV.   ARGUMENT

**A.    Plaintiff Is Likely to Prevail on His Claims.**

### 1.  Due Process Claims Under the Fifth Amendment

No person shall "be deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.  "A threshold requirement to a substantive or procedural due process claim is the plaintiff's showing of a liberty or property interest protected by the Constitution."  *Wedges/Ledges of Cal., Inc. v. City of Phoenix*, 24 F.3d 56, 62 (9th Cir. 1994) (citing *Board of Regents v. Roth*, 408 U.S. 564, 569–70 (1972)).  "The concept of 'substantive due process' . . . forbids the government from depriving a person of life, liberty, or property in such a way that 'shocks the conscience' or 'interferes with rights implicit in the concept of ordered liberty.'" *Nunez v. City of Los Angeles*, 147 F.3d 867, 871 (9th Cir. 1998).

Plaintiff does not need to wait until he is injured to seek redress for this violation of his right to due process.  His due process claim is "ripe if the perceived threat due to the putatively illegal conduct of the appellees is sufficiently real and immediate to constitute an existing controversy." *Valmonte v. Bane*, 18 F.3d 992, 999 (2d Cir. 1994) (citing *Blum v. Yaretsky*, 457 U.S. 991, 1000 (1982)).  Plaintiff is entitled to a constitutionally valid, facially legitimate reason for the government's denial of Plaintiff's ability to be employed by TikTok as that denial infringes upon his constitutional rights.  *See Bustamante v. Mukasey*, 531 F.3d 1059 (9th Cir. 2008); *see also Kerry v. Din,* 576 U.S. 86 (2015).

The fact that TikTok employees are not the direct targets of the Executive Order does not affect their right to due process.  As this Circuit pointed out in *Castaneda v. U.S. Department of Agriculture*, 807 F.2d 1478 (9th Cir.1987), the Supreme Court in *O'Bannon v. Town Court Nursing Center*, 447 U.S. 773 (1980), expressly left open the possibility that where the government indirectly yet intentionally injures or affects the legal status of a person by an action taken directly against a private third party, the injured person could maintain a due process challenge against the government.  *Id.* at 789–90 n. 22.

### a. Plaintiff Has Both a "Property" and "Liberty" Interest in His Employment

Plaintiff has both a property and liberty interest in his wages and salary from TikTok. "There can be no doubt that the plaintiff's interest in his salary and expense reimbursement is a property interest protected by the Constitution." *Sniadach v. Family Finance Corp.,* 395 U.S. 337, 342 (1969); *see also Orloff v. Cleland,* 708 F.2d 372, 378 (9th Cir. 1983) ("It is obvious that Orloff had a property interest in his salary."). Similarly, a person's "right to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference comes within the 'liberty' and 'property' concepts of the Fifth Amendment." *Greene v. McElroy*, 360 U.S. 474, 492 (1959); *see also Kartseva v. Dep't of State*, 37 F.3d 1524, 1529 (D.C.Cir. 1994) (acknowledging a "constitutionally protected 'right to follow a chosen trade or profession'" (quoting *Cafeteria & Rest. Wkrs. U., Loc. 473 v. McElroy*, 367 U.S. 886, 895–96 (1961))).

As the Ninth Circuit explained in *Merritt v. Mackey*:

"An individual has a liberty interest in employment protected by the Due Process Clause if the dismissal is 'for reasons that might seriously damage his standing in the community,' *Bollow v. Fed. Res. Bank*, 650 F.2d 1093, 1100 (9th Cir.1981), *cert. denied*, 455 U.S. 948 (1982), or if the dismissal effectively precludes future work in the individual's chosen profession, *Greene v. McElroy*, 360 U.S. 474 (1959)."

827 F.2d 1368, 1373 (9th Cir. 1987).

Due process, specifically under IEEPA, requires that Plaintiff be adequately informed of the reasons for the Executive Order so that he is afforded an opportunity to respond to the order in a meaningful way. *See Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury*, 686 F.3d 965, 1001 (9th Cir. 2012) (Treasury's Office of Foreign Assets Control violated organization's due process rights by "failing to provide an adequate statement of reasons for its investigation" under IEEPA.). The Due Process Clause also requires that the Defendants provide Plaintiff with a fair and impartial adjudication, both in appearance and in actuality. *Bustamante,* 531 F.3d at 1062. Here, no procedures of any kind allow Plaintiff or similarly situated employees to confront the evidence of the purported "national emergency" asserted in the Executive Order or otherwise respond to or challenge the order in any way.

The term "national security" ought not to be the talisman of pro tanto suspension of the due process clause and the right to a fair hearing: "The requirement of due process is not a fair-weather or timid assurance." *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 162 (1951) (Frankfurter, J., concurring).  Even assuming that national security is at risk in this case – albeit from the purported capture of information on Americans who dance and lip sync in fifteen second videos – those interests cannot justify the erasure of hundreds of American citizens' due process rights.

The history of this Executive Order demonstrates that the proffered "national security" rationale neither shaped the order's contours nor motivated its development.  When the government proffers a reason for challenged conduct, a court must assess whether the reason is "genuine, not a sham." *McCreary*, 545 U.S. at 864; *see Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 308 (2000) (explaining "the duty of the courts to distinguish a sham" purpose from a sincere one) (internal quotation marks and alteration omitted); *cf. Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000) (noting "the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt.'" (citation omitted)).

In this case, the White House adopted the Executive Order knowing full well that TikTok denies that it shares any information with the Chinese government and that this claim was corroborated by the CIA, which found "no evidence" that Chinese intelligence services have ever accessed data from TikTok.[7]  In other words, while the Executive Order, on its face, claims that preventing exfiltration of data to the Chinese government is its ultimate purpose, neither the order nor the President has made a case, credible or otherwise, that any data on TikTok users in the U.S. has ever been sent to Beijing.  The Executive Order professes to "protect our national security" because TikTok's data collection "*threatens* to allow the Chinese Communist Party access to Americans' personal and proprietary information –

---

[7] Rachel Sandler, *CIA Finds 'No Evidence' Chinese Government Has Accessed TikTok Data, Report Says*, Forbes (Aug. 8, 2020), https://www.forbes.com/sites/rachelsandler/2020/08/07/cia-finds-no-evidence-chinese-government-has-accessed-tiktok-data-report-says/#1b8590394c25.

*potentially* allowing China to track the locations of Federal employees and contractors, build dossiers of personal information for blackmail, and conduct corporate espionage." (emphases added). The Executive Order is couched in such equivocal language because this threat is merely speculative. It is on this theory alone that President Trump has ordered the destruction of more than 1,500 jobs at TikTok, forcing them to leave their jobs in the midst of the worst job market since the Great Depression.

### b. "Equal Protection" Component of the Fifth Amendment

The Supreme Court has found that the constitutional protections afforded persons under the Equal Protection Clause of the Fourteenth Amendment are applicable to the federal government under the Due Process Clause of the Fifth Amendment. *See Bolling v. Sharpe,* 347 U.S. 497, 498 (1954) (it would "be unthinkable that the same Constitution would impose a lesser duty on the Federal Government" than on the States). The Court in *Bolling* wrote that "the concepts of equal protection and due process, both stemming from our American ideal of fairness, are not mutually exclusive" and that "discrimination may be so unjustifiable as to be violative of due process." *Id.* at 499.

The Executive Order discriminates against Plaintiff and other U.S. employees of TikTok on the basis of the perceived nationality of the company they work for – in this case China – in that employees of other U.S. companies doing the exact same work or engaging in the exact same activities as TikTok employees are not subject to civil and criminal penalties or public shame and ridicule. As such, the Executive Order violates the equal protection component of the Due Process Clause of the Fifth Amendment. Additionally, The Executive Order was substantially motivated by personal animus toward TikTok – and has a disparate impact on TikTok (and its 1,500 U.S.-based employees) – because President Trump incorrectly believes that TikTok is a "Chinese-controlled" company, in further violation of the Due Process Clause of the Fifth Amendment.

The Executive Order deprives Plaintiff of this liberty interest by impugning TikTok's reputation (and that of its employees) and stigmatizing TikTok employees in the process. "[W]hen the government formally debars an individual from certain work or implements broadly preclusive criteria that prevents

pursuit of a chosen career, there is a cognizable deprivation of liberty that triggers the procedural guarantees of the Due Process Clause." *Abdelfattah v. Dep't of Homeland Sec.*, 787 F.3d 524, 538 (D.C. Cir. 2015).  Moreover, "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, that person's liberty interest is on the line, meaning that notice and an opportunity to be heard are essential." *Liff v. Office of Inspector Gen. for the U.S. Dep't of Labor,* 156 F.Supp. 3d 1, 10 (D.D.C. 2016).  This is particularly true "when the government imposes a stigma or other disability that forecloses the plaintiff's freedom to take advantage of other employment opportunities." *Liff,* 156 F.Supp.3d at 12.

### c.  "Vagueness" Claim

The Executive Order is unconstitutional in that it leaves Plaintiff and those similarly situated to him with no concept of whether, by merely accepting a paycheck or even showing up at work, they will run afoul of the Executive Order.  The two due process concerns arising out of the vagueness doctrine are that "first, . . . regulated parties should know what is required of them so they may act accordingly; [and] second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *F.C.C. v. Fox Television Stations, Inc.,* 567 U.S. 239 (2012).  "A statute which either forbids or requires the doing of an act in terms so vague that [people] of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential [tenet] of due process law." *Id.*  at 253 (quoting *Connally v. General Constr. Co.,* 269 U.S. 385, 391 (1926)).

Here, the Executive Order prohibits "any transaction by any person . . . with ByteDance Ltd . . . or its subsidiaries . . ." and thereby provides Plaintiff no clear understanding of which actions are barred. (Ryan Decl. ¶ 20.)  The Executive Order does not define "transaction," other than to say that "45 days after the date of this order, the Secretary [of Commerce] shall identify the transactions subject to subsection (a) of this section."  This provides absolutely no guidance as to what activities might constitute a "transaction" and there is no way to anticipate the scope of the term until the order takes

effect.  This is particularly chilling because the Executive Order also declares that "[a]ny conspiracy formed to violate any of the prohibitions set forth in this order is prohibited."  It is possible that Plaintiff might be engaging in the predicate acts of a conspiracy right now simply by showing up to work and keeping the TikTok platform operational.  These concerns are real, and dozens of TikTok employees are fearful about what they should be doing – *or not doing* – right now so as not to run afoul of the Executive Order.  (Ryan Decl. ¶ 19–22.)

Concern about vagueness is heightened when, as here, criminal penalties are possible for violations of the Executive Order.  *See Reno v. ACLU,* 521 U.S. 844, 871 (1997).  Violation of the Executive Order is punishable by a fine of up to $1 million and imprisonment of up to 20 years. 50 U.S.C. § 1705(b)–(c).  Such severe penalties serve to coerce Plaintiff into taking the most drastic cautionary steps to avoid any possibility of breaking the law, demonstrating that the vagueness of the Executive Order violates Plaintiff's due process rights.[8]

### 2. *Ultra Vires* Claim

Plaintiff has a claim in equity and under the All Writs Act, 28 U.S.C. § 1651, to declare unlawful and to enjoin a Presidential executive order that is *ultra vires*.  *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) ("The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England.").  IEEPA grants the President authority to regulate various

---

[8] The Executive Order also may be seen as the functional equivalent of a bill of attainder. The Constitution prohibits Congress from passing bills of attainder in Article I, Section 9. Although commonly interpreted as a limit on legislative acts aimed at extrajudicial criminal punishment of individuals, the bill of attainder prohibition has been applied to invalidate state constitutional provisions, *Cummings v. Missouri,* 4 Wall 277 (U.S. 1866), and Congressional prohibitions of wage payments to federal employees Congress judged guilty of "subversive activity." *United States v. Lovett,* 328 U.S. 303 (1946). Although an executive order is not a "legislative act," Plaintiff urges this Court to find that, just as the Due Process Clause was found to encompass the equal protection provisions of the 14th Amendment, it should also be found to encompass the Article I prohibition of extrajudicial punishments such as bills of attainder. *See generally,* Wylie H. Davis, *United States v. Lovett and the Attainder Bogy in Modern Legislation* Wash. U. L Q. 013 (1950).

international economic transactions upon the declaration of a national emergency "to deal with any

unusual and extraordinary threat, which has its source in whole or substantial part outside the United

States, to the national security, foreign policy, or economy of the United States." 50 U.S.C. § 1701(a).

Before the President is empowered to exercise authority under IEEPA, the President must first declare a

national emergency for purposes of the NEA, 50 U.S.C. § 1601 et seq.

> On May 15, 2019, President Trump declared that

> "the unrestricted acquisition or use in the United States of information and communications technology or services designed, developed, manufactured, or supplied by persons owned by, controlled by, or subject to the jurisdiction or direction of foreign adversaries augments the ability of foreign adversaries to create and exploit vulnerabilities in information and communications technology or services, with potentially catastrophic effects, and thereby constitutes an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States."

*See* Executive Order 13873.  In his Executive Order targeting TikTok, President Trump drew upon the

emergency declared in Executive Order 13873, asserting that "additional steps must be taken to deal

with the national emergency with respect to the information and communications technology and

services supply chain," and that, "[a]t this time, action must be taken to address the threat posed by one

mobile application in particular, TikTok."

The actions directed in the Executive Order, however, are not supported by the emergency

declared a year earlier in Executive Order 13873.  That earlier executive order was designed to address

national security concerns about certain telecommunications companies' ability to abuse access to

"information and communications technology and services."  TikTok Inc. is not a telecommunications

provider and it does not provide the types of services contemplated by the earlier executive order.

The Executive Order also fails to identify any actual threat that TikTok poses to the national

security of the United States.  The order merely claims, without explanation, that TikTok engages in

data collection practices that "potentially allows China" to make use of U.S. user data for nefarious

purposes, "reportedly censors content," and "may be used for disinformation campaigns." These

speculative assertions, made without any evidence, cannot constitute a bona fide national emergency.

B.      **Plaintiff Will Suffer Irreparable Harm Absent This Court's Intervention**

Where financial harm cannot be recovered from the government (because of sovereign

immunity), the harm should be considered irreparable.  *See Air Transport Ass'n of America v. Export-*

*Import Bank,* 840 F. Supp. 2d 327, 335–36 (D.D.C. 2013).  This Circuit has adopted a stricter test, but it

did not foreclose the possibility that irreparable harm can stem from the loss of employment where

plaintiff "has proffered evidence that he will experience emotional distress and loss of job satisfaction."

*Heineke v. Santa Clara Univ.,*  736 F.App'x 622, 624 (9th Cir. 2018); *see also Calvillo Manriquez v.*

*Devos,* 345 F. Supp. 3d 1077, 1107 (N.D. Cal. 2018).

Here, Plaintiff will not only lose his income if the Executive Order is not enjoined, but he is

suffering and will continue to suffer emotional and reputational injuries.  Plaintiff has received or is

aware of many comments on social media calling TikTok employees disloyal Americans or Communist

sympathizers.  President Trump's coarse rhetoric and virulent supporters pose a serious risk to Plaintiff

of retaliation and physical violence and social media trolling.  Plaintiff also is concerned that his resume

will be besmirched due to his TikTok employment, making it more difficult to find future employment.

(Ryan Decl. ¶¶ 15–22).

C.      **The Public Interest and Balance of Equities Weigh in Plaintiff's Favor**

Plaintiff and other U.S. employees of TikTok are in imminent danger of losing their livelihood

through governmental action that has no basis in fact, was politically driven, and afforded Plaintiff no

procedural protections.  The 1,500 TikTok employees working in the US and their families will not be

able to pay their rent or mortgages, or pay for food, medical treatments, and other essentials of life.  The

Executive Order has offered no evidence that TikTok has breached national security interests, is capable

of breaching national security interests or is about to breach national security interests.  Further, "it is

always in the public interest to prevent the violation of a party's constitutional rights."  *Melendres v.*

*Arpaio,*  695 F.3d 990, 1002 (9th Cir. 2012).  The federal government's interest in enforcing orders

related to national security, absent any evidence of an actual credible threat, cannot outweigh the real harms that the Plaintiff will face at the hands of the Defendants.

## D.        The Court Should Waive Bond

Plaintiff requests that the Court waive the security requirement for this injunctive relief under Federal Rule of Civil Procedure 65(c), which invests the district court "with discretion as to the amount of security required, *if any*," and courts may require no bond where, as is true here, there is no likelihood of harm to Defendants from enjoining the Executive Order to the extent it purports to prohibit payment of wages and salary, or even provide guarantees of continued employment, of U.S. employees of TikTok. *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (emphasis in the original).

## V.        CONCLUSION

For the reasons stated above, Plaintiff respectfully requests that this Court grant his motion to prevent the implementation of the Department of Commerce from enforcing the Executive Order to the extent such order prohibits TikTok, Inc. from paying wages and salaries to its U.S. employees.

Dated:  September 5, 2020

BLACKSTONE LAW GROUP LLP
By: /s/ John D. Lovi
     John D. Lovi (john@blackstone-law.com)*
     Justin B. Perri (justin@blackstone-law.com)*
     Alexander J. Urbelis (alex@blackstone-law.com)*
1201 Broadway, 9th Floor
New York, New York 10001
Telephone/ Facsimile: (212) 779-3070
*Lead Counsel for Plaintiff Patrick S. Ryan*

* *Pro Hac Vice Applications Forthcoming*

By: /s/ Patrick S. Ryan
     Patrick S. Ryan – Cal. Bar No. 243711
     Michael Godwin (mike@godwins.law)*
1454 12th Street
Oakland, California 94607
Tel.: (512) 333-1287
*Local Counsel to Plaintiff*