1  DAVID GREENE (SBN 160107)
   (davidg@eff.org)
2  ELECTRONIC FRONTIER FOUNDATION
   815 Eddy Street
3  San Francisco, CA 94109
   Telephone: (415) 436-9333
4  Facsimile: (415) 436-9993

5

6  *Attorney for Amici Curiae*
   *Electronic Frontier Foundation, Ryan Jackson*
7  *and Jynx*

8

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| PATRICK S. RYAN,<br><br>                              Plaintiff,<br><br>        v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States of America,<br><br>        and<br><br>WILBUR L. ROSS, JR., in his official capacity as United States Secretary of Commerce,<br><br>                              Defendants. | Case No. 3:20-cv-05948 (VGC)<br><br>**AMICUS BRIEF OF ELECTRONIC FRONTIER FOUNDATION, RYAN JACKSON, AND JYNX IN SUPPORT OF PLAINTIFF'S REQUEST FOR A TEMPORARY RESTRAINING ORDER**<br><br>Date:   September 15, 2020<br>Time:  9:00 a.m.<br><br>Complaint Filed: August 24, 2020 |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES............................................................................................ii

STATEMENT OF INTEREST ......................................................................................1

ARGUMENT...................................................................................................................2

I.  Plaintiffs' Constitutional Claims Must Be Given Greater Deference When the Governmental Activity Would Have a Significant Effect on the First Amendment Rights of the Platform's Users. ...............................................................................................................................2

   A.  Any Established Community of Speakers Is Unique, and Its Removal Cannot Be Tolerated Simply Because Users Can Still Communicate Through Other Means. ..............................2

   B.  The First Amendment Sharply Limits Restrictions on Intermediaries Because Such Measures Inevitably Lead to Unnecessary Censorship. .........................................................5

   C.  This Court Must Apply a Higher Standard of Scrutiny When these First Amendment Interests are Intertwined with Fifth Amendment Claims. ....................................................6

   D.  Executive Order 13492 Must Be Narrowly Tailored to Meet Any National Security Interests. .................................................................................................................................8

CONCLUSION................................................................................................................9

i

1

# TABLE OF AUTHORITIES

2

*Cases*

3

*Arkansas Writers' Project, Inc. v. Ragland,*
   481 U.S. 221, (1987) ............................................................................................ 8

4

*Bantam Books, Inc. v. Sullivan,*
   372 U.S. 58 (1963) ......................................................................................... 5, 6

5

6

*Boyd v. U.S.,*
   116 U.S. 616 (1886) ......................................................................................... 7

7

*Cantwell v. Connecticut,*
   310 U.S. 296 (1940) ......................................................................................... 8

8

9

*Center for Democracy & Technology v. Pappert,*
   337 F. Supp. 2d 606 (E.D. Pa. 2004) ............................................................... 6

10

*Cubby v. CompuServe, Inc.,*
   776 F. Supp. 135 (S.D.N.Y 1991) .................................................................... 6

11

12

*Denver Area Educ. Telecomms. Consortium v. FCC,*
   518 U.S. 727 (1996) ...................................................................................... 5, 6

13

*Frank v. Maryland,*
   359 U.S. 360 (1959) ......................................................................................... 7

14

15

*Midwest Video Corp. v. FCC,*
   571 F.2d 1025 (8th Cir. 1978) ......................................................................... 5

16

*N.Y. Times Co. v. Sullivan,*
   376 U.S. 254 (1964) ......................................................................................... 5

17

*NAACP v. Alabama,*
   357 U.S. 449 (1958) ...................................................................................... 2, 7

18

*NAACP v. Button,*
   371 U.S. 415 (1963) ......................................................................................... 8

19

*Packingham v. North Carolina,*
   137 S. Ct. 1730 (2017) ................................................................................1, 4, 6

20

21

*Reno v. ACLU,*
   521 U.S. 844 (1997) ......................................................................................... 6

22

*Roaden v. Kentucky,*
   413 U.S. 496 (1973) ...................................................................................... 7, 8

23

24

*Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.,*
   502 U.S. 105 (1991) ......................................................................................... 8

25

*Smith v. California,*
   361 U.S. 147 (1959) ...................................................................................... 5, 6

26

27

*Stanford v. Texas,*
   379 U.S. 476 (1965) ......................................................................................... 7

28

ii

*United States v. Playboy Entm't Grp., Inc.,*
    529 U.S. 803 (2000) ............................................................................................... 6

*Zurcher v. Stanford Daily,*
    436 U.S. 547 (1978) ............................................................................................... 7

**Other Authorities**

*Amicus Curiae Brief of Electronic Frontier Foundation, Public Knowledge, and Center for
    Democracy & Technology in Support of Petitioner, Packingham v. State of North Carolina* (Sup.
    Ct. No. 15-1194) ................................................................................................... 1

John Herrman, *TikTok Is Shaping Politics. But How?,* N.Y. TIMES, June, 28, 2020 ......................... 3

Max Beaumont, *Dear President Trump: An Open Letter From The TikTok Creator Community,*
    MEDIUM, Aug. 2, 2020 .............................................................................................. 4

Queenie Wong, *Why Trump supporters are showing up in your TikTok feed*, CNET
    (Nov. 20, 2019) ..................................................................................................... 1

Rebecca Jennings, *TikTok never wanted to be political. Too late.*, VOX (Jan. 22, 2020) .................. 3

Taylor Lorenz, Kellen Browning, & Sheera Frenkel, *TikTok Teens and K-Pop Stans Say They Sank
    Trump Rally*, N.Y. TIMES, June 21, 2020 ...................................................................... 3

Taylor Lorenz, *TikTok Ban? Creators and Fans Are Big Mad*, N.Y. TIMES, Aug. 2, 2020 ............... 3

iii

CASE NO. 3:20-CV-05948 (VGC)                    AMICUS BRIEF OF ELECTRONIC FRONTIER FOUNDATION ET AL.

**STATEMENT OF INTEREST**

Recognizing the Internet's power as a tool of democratization, for 30 years, amicus curiae Electronic Frontier Foundation (EFF) has worked to protect the rights of users to transmit and receive information online, including users of social media platforms like TikTok. EFF is a non-profit civil liberties organization with more than 30,000 dues-paying members, bound together by a mutual and strong interest in helping the courts ensure that such rights remain protected as technologies change, new digital platforms for speech emerge and reach wide adoption, and the Internet continues to re-shape governments' interactions with their citizens. EFF frequently files *amicus* briefs in courts across the country, including, relevant here, a brief to the Supreme Court in *Packingham v. North Carolina*, 137 S. Ct. 1730 (2017).[1]

Amicus curiae Ryan Jackson (known online as "Lillith Ashworth") is a well-known TikTok user with over forty thousand followers and nearly a million and a half "likes." Jackson uses Tiktok to talk about internal US politics and geopolitics; one TikTok Jackson posted on the Lillith Ashworth account that critiqued Democratic presidential candidates was viewed more than two million times.[2] Jackson finds TikTok to be unique because, more than any other social media platform, it caters to smaller channels, giving them a greater chance of being seen and becoming popular.

Amicus Curiae Jynx, a pseudonym, maintains an 18+ adult only TikTok account in which the content centers on radical leftist liberation, feminism, and decolonial politics, as well as content regarding the labor rights of strippers. Jynx has well over one hundred thousand followers and 1.7 million "likes."  Jynx finds TikTok to be a uniquely effective way of communicating with their community because the app more easily allows for the content of noncommercial speakers to gain a

---

[1] *See Amicus Curiae Brief of Electronic Frontier Foundation, Public Knowledge, and Center for Democracy & Technology in Support of Petitioner, Packingham v. State of North Carolina* (Sup. Ct. No. 15-1194), https://www.eff.org/files/2016/12/22/2016-12-22_-_packingham_v._nc_-_amicus_brief_of_eff_pk_and_cdt.pdf.

[2] Queenie Wong, *Why Trump supporters are showing up in your TikTok feed*, CNET (Nov. 20, 2019), https://www.cnet.com/news/why-trump-supporters-are-showing-up-in-your-tiktok-feed/.

wide audience.

**ARGUMENT**[3]

**I.      Plaintiffs' Constitutional Claims Must Be Given Greater Deference When the Governmental Activity Would Have a Significant Effect on the First Amendment Rights of the Platform's Users.**

This action concerns constitutional challenges to a government directive, Executive Order 13492. While such claims must always be examined closely, an even higher degree of scrutiny must be applied when the governmental action has a direct and arguably intentional effect on millions of people's First Amendment rights to communicate free of government interference. The U.S. Supreme Court has recognized that the protections of the Bill of Rights often work in conjunction and must be evaluated together. Applying that principle in this case, it is clear that the Executive Order's effect on the First Amendment rights of the community of TikTok users warrants a more thorough and exacting review of the equal protection, due process and vagueness arguments raised by Plaintiff.

**A.      Any Established Community of Speakers Is Unique, and Its Removal Cannot Be Tolerated Simply Because Users Can Still Communicate Through Other Means.**

The free-speech implications of the President's action are clear, not only for the individuals who wish to speak, but for the community they have created. As the U.S. Supreme Court has held, "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association, as this Court has more than once recognized by remarking upon the close nexus between the freedoms of speech and assembly." *NAACP v. Alabama*, 357 U.S. 449, 460 (1958).

TikTok is a platform that allows users to create and share short videos with music, filters, and other features. Despite its simple premise, TikTok has grown to provide a unique service to its users that cannot be effectively replaced by other platforms. The platform's users have come

---

[3] The First Amendment Clinic, Sandra Day O'Connor College of Law at Arizona State University; Executive Director Gregg Leslie, Legal Fellow Laura Layton; and students Phillip Tomas and Ryan Lee, provided valuable assistance in the preparation of this brief.

2

together to form communities to share ideas in ways they have not been able to on other platforms. Unlike most other social media platforms, TikTok does not depend on users establishing "friends" or "followers" in order to communicate; instead, posts made to the platform are widely shared and often connected by themes.[4] A user can create a unique posting and suddenly find it has been viewed by thousands, if not millions, of strangers.

As such, the service "has become an information and organizing hub for Gen Z activists and politically-minded young people."[5] TikTok has also become an important stage for political activism and ideological formation among the younger generations on all places along the political spectrum; the platform "has amplified footage of police brutality as well as scenes and commentary from Black Lives Matter protests around the world, with videos created and shared on the platform frequently moving beyond it."[6]

Some of the political activism on TikTok has recently focused on President Trump. A group of TikTok teens claim to have launched a campaign to get users to inflate the attendance expectations at President Trump's Tulsa, Oklahoma, rally in June.[7] Another TikTok user, Sarah Cooper, has gained notoriety for her satirical posts about the President, where she points out what she sees as the absurdities of some of his statements merely by lip-synching short audio clips of his speeches.

After President Trump announced that he was looking at a TikTok ban on July 31, twenty of TikTok's top users published an open letter urging the President to consider alternatives to a ban

---

[4] *See* Rebecca Jennings, *TikTok never wanted to be political. Too late.*, VOX, Jan. 22, 2020, https://www.vox.com/the-goods/2020/1/22/21069469/tiktok-memes-funny-ww3-politics-impeachment-fires ("On TikTok, users don't have to follow anyone to see videos the app thinks they might like. As on Reddit, information can come from anywhere, as long as enough people favorite it. That's how Gem Nwanne, a 24-year-old grad student, data analyst, and activist in New York, went viral after posting a video about the city's crackdown on subway fare evasion.").

[5] Taylor Lorenz, *TikTok Ban? Creators and Fans Are Big Mad*, N.Y. TIMES, Aug. 2, 2020, https://www.nytimes.com/2020/08/02/style/tiktok-ban-threat-trump.html.

[6] John Herrman, *TikTok Is Shaping Politics. But How?,* N.Y. TIMES, June, 28, 2020. https://www.nytimes.com/2020/06/28/style/tiktok-teen-politics-gen-z.html.

[7] Taylor Lorenz, Kellen Browning, & Sheera Frenkel, *TikTok Teens and K-Pop Stans Say They Sank Trump Rally*, N.Y. TIMES, June 21, 2020, https://www.nytimes.com/2020/06/21/style/tiktok-trump-rally-tulsa.html.

3

because of the unique service TikTok provides and the particular opportunities TikTok created for them.

> TikTok is different: the content you consume can come from anyone. This gives creators a voice in a way that friend oriented social networks can't. … TikTok is also the only social media platform helping to counter the growing polarization in the U.S. Facebook, Instagram and Twitter offer a personalized news feed oriented around people you interact with on a daily basis. This can create an environment where users are only exposed to people who share their ideas. TikTok offers a seemingly random way to discover new content prioritizing strangers, not contacts.[8]

This unique nature does not mean the service needs to be seen as something *better* than any other social media network, but instead demonstrates that a community of speakers and creators cannot simply be expected to migrate their activities to another service *en masse* and continue without any negative effect. The First Amendment rights of speech, assembly and association must be considered in an examination of the government's actions.

The U.S. Supreme Court has recognized that "cyberspace"—and "social media in particular"—is "the most important place[] . . . for the exchange of views" and that "social media users . . . engage in a wide array of protected First Amendment activity on topics 'as diverse as human thought.'" *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735–36 (2017) (citations omitted). In *Packingham*, the Court struck down a North Carolina law which prohibited sex offenders from accessing social networking websites if the sex offender knows the site permits access to minors. *Id* at 1733. In doing so, the Supreme Court said this law would not even survive intermediate scrutiny, *id.* at 1736, much less strict scrutiny. In the Court's words, the assertion of a valid governmental interest "cannot, in every context, be insulated from all constitutional protections." *Id.*

Social media, especially TikTok, allows users to communicate "on any subject that might come to mind." *Id.* Reinforcing the scope of expression protected by the First Amendment, the Court stressed that courts "must exercise extreme caution before suggesting the First Amendment provides scant protection for access to vast networks in that medium." *Id.*

---

[8] Max Beaumont, *Dear President Trump: An Open Letter From The TikTok Creator Community*, MEDIUM, Aug. 2, 2020, https://medium.com/@whoismax/dear-president-trump-an-open-letter-from-the-tiktok-creator-community-e56b21c682fb.

4

CASE NO. 3:20-CV-05948 (VGC)                    AMICUS BRIEF OF ELECTRONIC FRONTIER FOUNDATION ET AL.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### B.   The First Amendment Sharply Limits Restrictions on Intermediaries Because Such Measures Inevitably Lead to Unnecessary Censorship.

A ban on TikTok violates fundamental First Amendment principles by eliminating a specific type of speaking, the unique expression of a TikTok user communicating with others through that platform, without sufficient considerations for the users' speech. Even though the order facially targets the platform, its censorial effects are felt most directly by the users, and thus their First Amendment rights must be considered in analyzing its legality.

The Supreme Court has repeatedly recognized that laws threatening to impose liability on a provider of a forum for the speech of others pose a special threat to the rights of speakers and readers who depend on that service. For example, in *Smith v. California*, 361 U.S. 147 (1959), the Court struck down a law holding booksellers strictly liable for shelving obscene books because the law would in effect compel self-censorship by the bookstore. The Court noted the problem was "[t]he bookseller's limitation in the amount of reading material with which he could familiarize himself, and his timidity in the face of his absolute criminal liability, thus would tend to restrict the public's access to forms of the printed word which the State could not constitutionally suppress directly." *Id.* at 153-54.

Similarly, the Court struck down Rhode Island's bookseller liability laws in *Bantam Books, Inc. v. Sulliva*n, 372 U.S. 58 (1963). The Court later upheld cable programmers' First Amendment challenge to laws requiring cable operators to segregate and block patently offensive sexual content. *Denver Area Educ. Telecomms. Consortium v. FCC*, 518 U.S. 727 (1996); *see also N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 266 (1964) (holding that the imposition of liability on a newspaper for third party advertisements "would discourage newspapers from carrying 'editorial advertisements' … and so might shut off an important outlet for the promulgation of information and ideas by persons who do not themselves have access to publishing facilities"); *Midwest Video Corp. v. FCC*, 571 F.2d 1025, 1056 (8th Cir. 1978) (striking the FCC requirement for cable operators to block programmers' unlawful speech, noting that it created "a corps of involuntary government surrogates, but without providing the procedural safeguards respecting 'prior restraint' required of the government").

5

In the context of the Internet, the concerns expressed by the Court in *Smith*, *Bantam Books*, and *Denver Area* are only amplified due to the massive volume of speech passing through online intermediaries. Accordingly, in *Center for Democracy & Technology v. Pappert*, 337 F. Supp. 2d 606, 649–50 (E.D. Pa. 2004), the court struck down a Pennsylvania statute requiring Internet service providers (ISPs) to block child pornography upon notice, which led ISPs to block additional, lawful content as well. The court reasoned that even though the law, "on its face, does not burden protected speech[,] … the action taken by private actors to comply with the Act has blocked a significant amount of speech protected by the First Amendment." *Id*. at 652 (applying *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803 (2000)). *See also Cubby v. CompuServe, Inc.*, 776 F. Supp. 135, 139 (S.D.N.Y 1991)) (expressing concerns "deeply rooted in First Amendment" that an intermediary not be treated as a publisher in defamation case).

Given inevitable over-censorship, courts "must exercise extreme caution" and review with greater scrutiny any law that purports to regulate speech on the "vast democratic forums of the Internet." *Packingham*, 137 S. Ct. at 1735–36 (quoting *Reno v. ACLU*, 521 U.S. 844, 868 (1997)).

## C. This Court Must Apply a Higher Standard of Scrutiny When these First Amendment Interests are Intertwined with Fifth Amendment Claims.

*Amici* urge the court to adopt a higher standard of scrutiny when reviewing plaintiff's claim against the President. Not only are the plaintiff's Fifth Amendment liberties at stake, but millions of TikTok users have First Amendment freedoms at stake. The Fifth Amendment and the First Amendment are each critical in securing life, liberty, and due process of law. When these amendments are examined separately, they each deserve careful analysis; but when the interests protected by these amendments come together a court should apply an even higher standard of scrutiny.

The U.S. Supreme Court has long recognized this interconnection of the rights protected by the Bill of Rights:

> It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the "liberty" assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech. *See Gitlow v. New York*, 268 U. S. 652, 666; *Palko v. Connecticut*, 302 U. S. 319, 324; *Cantwell*

6

> *v. Connecticut*, 310 U. S. 296, 303; *Staub v. City of Baxley*, 355 U. S. 313, 321. Of course, it is immaterial whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters, and state action which may have the effect of curtailing the freedom to associate *is subject to the closest scrutiny*.

*NAACP v. Alabama*, 357 U.S. at 460–61 (emphasis added).

For instance, the Supreme Court has long recognized a First Amendment interest in the Fourth Amendment. When a warrant implicates First Amendment interests, the warrant must "particularly describe the 'things to be seized is to be accorded the most *scrupulous exactitude* when the 'things' are books . . . . No less a standard could be faithful to the First Amendment freedoms." *Stanford v. Texas,* 379 U.S. 476, 485 (1965) (emphasis added). *See also Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978) ("Where the materials sought to be seized may be protected by the First Amendment, the requirements of the Fourth Amendment must be applied with 'scrupulous exactitude.'"); *see also Frank v. Maryland,* 359 U.S. 360, 376 (1959) (Douglas, J., dissenting) (explaining that the First and Fourth Amendments "are indeed closely related, safeguarding not only privacy and protection against self-incrimination but 'conscience and human dignity and freedom of expression as well'").

Fifth Amendment due process and equal protection concerns warrant a similar "scrupulous exactitude." More than a century ago, the Court recognized this connection between the Fourth Amendment and at least the self-incrimination clause of the Fifth Amendment in *Boyd v. U.S.,* 116 U.S. 616 (1886). The law at issue required a person to produce his private papers, books, or invoices over to the court and if not, the government's allegations would be taken as confessed. *Id.* Rejecting the government's argument, the Supreme Court held

> that the fifth amendment which declares that no person shall be compelled in any criminal case to be a witness against himself; and we are further of opinion that a compulsory production of the private books and papers of the owner of goods sought to be forfeited in such a suit is compelling him to be a witness against himself, within the meaning of the fifth amendment to the constitution, and is the equivalent of a search and seizure – and an unreasonable search and seizure – within the meaning of the fourth amendment.

*Boyd*, 116 U.S. at 634–35.

In *Roaden v. Kentucky*, 413 U.S. 496 (1973), the Court recognized a First Amendment

7

CASE NO. 3:20-CV-05948 (VGC)                    AMICUS BRIEF OF ELECTRONIC FRONTIER FOUNDATION ET AL.

interest in a case involving a Fourth Amendment issue. A police officer lawfully attended a drive-in movie theater, and solely based on his opinion that the movie was obscene, he seized it without a warrant. 413 U.S. at 506. The Court held that the "seizure is unreasonable, not simply because it would have been easy to secure a warrant, but rather because prior restraint of the right of expression, whether by books or films, calls for a higher hurdle in the evaluation of reasonableness." *Id.* at 504. Likewise, a government action affecting the right to continue operating a forum of speech like TikTok also demands a higher hurdle for what is reasonable activity.

The court should also apply a stricter standard to Plaintiff's "vagueness" claim. Because the "First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." *NAACP v. Button,* 371 U.S. 415,433 (1963) (citing *Cantwell v. Connecticut*, 310 U.S. 296 (1940). The Court held that if the "line" a statute draws is an ambiguous one, it "will not presume that the statute curtails constitutionally protected activity as little as possible"; indeed, if the law at issue prohibits the exercise of First Amendment freedoms, it is invalid. *Id.* at 432. The Supreme Court explained that vagueness and overbreadth raise "the danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application," because "the threat of sanctions deter their exercise almost as potently as the actual application of sanctions." *Id.* at 433.

### D. Executive Order 13492 Must Be Narrowly Tailored to Meet Any National Security Interests.

Because a higher standard of scrutiny must be applied in the presence of these overwhelming First Amendment concerns, the government must narrowly tailor Executive Order 13492 to serve the compelling interest identified. *See, e.g.*, *Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.*, 502 U.S. 105, 118 (1991); *Arkansas Writers' Project, Inc. v. Ragl*and, 481 U.S. 221, 231 (1987). Banning TikTok entirely does not come close to meeting this standard. It is hard to imagine the national security interests that would be compromised by a foreign power knowing viewership data of most of the content on TikTok. Accordingly, the complete ban is not at all sufficiently narrowly tailored.

A more narrowly tailored solution could have been to restrict the type or amount of tracking or logging data that may be sent to foreign interests, or to regulate uses of the app on government devices.

As long as such an obvious, narrower solution is available to the government to protect the stated interest, the elimination of a social media platform is unlawful.

### CONCLUSION

Amici urge this Court to grant Plaintiff's Motion for Preliminary Injunction because the Defendants cannot show their Order would survive strict scrutiny, particularly when it is applied with the "scrupulous exactitude" required because of the intertwined First Amendment interests.

DATED:  September 10, 2020

Respectfully submitted,

*/s/ David Greene*

DAVID GREENE (SBN 160107)
(davidg@eff.org)
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Telephone: (415) 436-9333
Facsimile: (415) 436-9993

*Attorney for Amici Curiae*
*Electronic Frontier Foundation,*
*Ryan Jackson and Jynx*

9